Argument in Eid v. Alaska Airlines Good morning, Your Honor. It's Gilbert Gaynor for the appellants. There are three issues relating to the Tokyo Convention, the Warsaw Convention, and the supplemental complaint. As to the first issue, Your Honors, Alaska argues in its brief that it's undisputed what the captain knew. This is not true. There's substantial evidence from which a reasonable jury could conclude that the captain lied about what happened on the plane, knowingly adopted the flight attendant's false account on the ground, acting with malice, and depriving the airline of any conceivable Tokyo Convention defense. And let me be specific about what that evidence is. There is an independent witness, Kimberly Shealy, whose declaration was never mentioned by the district court and was never even alluded to by Alaska in their brief. And she was a first-class passenger in the 12-seat first-class section of this flight. Her declaration bears directly on what the captain claims in his deposition he knew. Per Ms. Shealy, the second flight attendant, not the lead attendant, as the captain testified, told the older gentleman, that's Mr. Gaynor, the vice chair of Egyptian National Gas Company, to sit down. He promptly did so, and the flight attendant then, in Ms. Shealy's words, quote, went ballistic, unquote, yelling at these seated passengers. Mrs. Gaynor says- You're quoting from the passenger's- From Ms. Shealy, the independent, unaffiliated witness. What does that have to do with what the- I'm just about to tell you, Your Honor. According to this independent witness, the flight attendant then said, that's it. I'm taking this plane down. Now, and this is the critical sentence. According to Ms. Kimberly Shealy, who was right there, quote, all discussion and loud voices stopped. She went and got a phone. Then the plane began descending. This is corroborated by Mr. Mansour at page 309. Now, the pilot testified that at the time of what he says is the second phone call, he heard a bunch of yelling and screaming in the background. And he says this more than once. And he says it in his report as well. On the basis of this conflict in the testimony, the jury would be entitled to find that the captain is not telling the truth. Are you claiming that the captain's decisions were motivated by discriminatory animus? We're claiming that he's lying about this, Your Honor, and that his reasons for decision create a material question of fact for the jury. He's lying about which fact? He's lying about the facts that he said motivated him to take the actions he did. He said in his deposition at page 153 of the record, 154, 155, that the reason he brought this up is that he was a flight attendant number one. And he said the plane, the first-class captain cabin was out of control, and he, the captain, could hear yelling and screaming in the background. That's false. This is a tube flying 30,000 feet in the air, traveling 500 miles an hour. Like all aircraft. And the captain has 25 years of experience. Apparently so. He hears yelling and screaming. He says he hears that. There's a factual dispute. Counsel, counsel, would you just let Judge Otero finish his questions and really calm down? I'm sorry, Your Honor. You've got limited time. That's my concern. You're not doing your clients a service at all by getting excited or failing to listen to questions. So when a judge asks you a question, listen, please. I will. The record reflects that he hears commotion, yelling and screaming. The stewardess says she's lost control of the first-class passengers. He takes the plane down. He makes a decision on the spot to take the plane down. As he mentioned, he's never been through that in 26 years. Why isn't that reasonable? First of all, much of it is controverted, Your Honor. It's controverted, a material question of fact, as to whether he heard that yelling and screaming. Ms. Shealy and Mr. Mansour testify unequivocally that the only person yelling was the flight attendant. Therefore, the captain couldn't, at the time he said he heard the screaming, have heard anything. Secondly, there is a material question of fact as to whether he, the captain ---- So what? I mean, let's say the he misremembered or let's even say he embellished or outright lied about the screaming. I mean, let's assume all of that. There's no dispute, I don't think, and correct me if I'm wrong after I finish my question, there's no dispute that the flight attendant called up and said things to the captain that indicated that she thought there was an emergency. Your Honor, there is a dispute as to what was said, as to how many times was said, et cetera, and what was going on. Listen to me again. Yes. And don't answer some other question. Just answer the question I'm asking you. Do you remember the question I asked? Yes. You're asking whether there is a dispute as to whether the captain was told at some point by a flight attendant that the first-class cabin was out of control. And there is some dispute as to that. In his initial report, he doesn't say out of control. Go ahead. What dispute is that? Well, in his initial report, he doesn't say out of control. Then he says the flight attendant told him that things were getting out of hand, which indicates a somewhat lesser degree of urgency. But we don't dispute that there was a conversation between one of the flight attendants, although there is a dispute as to which one, and the captain, after which the captain brought the plane down, and that the captain testified that the — inconsistently with his previous statement, that the flight attendant said it was out of — the cabin was out of control. That much is clear. And you're not claiming that the — that the captain is making it up? That, in particular? Just listen.  The 10-minute time limit, Your Honor. Well, you know, if you want to do that, that's — I don't, Your Honor. You're not doing your client any good. I mean, this is the only chance you're going to have to hear what our concerns are. And if you think you already know these concerns and you're going to guess the question ahead of time, you're not going to serve your client. I apologize, Your Honor. I will listen carefully. I will not caution you again. Thank you, Your Honor. Next time you cut me off, I will let you do it. And then you can go ahead and answer whatever you choose to answer, whether it is what I'm concerned about or not. Do you understand? Yes, Your Honor. Do we understand each other? I hope so. I understand you, Your Honor. At least, I believe I do. Now, I've lost track of what I wanted to ask you. Your Honor, I believe we were fixing on the question of what was disputed and what was undisputed about what the pilot knew. Do you dispute that the captain – you do not claim that the captain got a phone call from the flight attendant who said, everything is hunky-dory in the cabin, and the captain is lying about that and saying, I got an emergency call. You're not claiming that. We're not claiming he's lying when he says he got one phone call. It's a dispute as to whether he's telling the truth as to whether he got two. Okay. So, what difference does that make? It shows that he's lying about the entire incident. Well, but if you concede that he got a phone call from a crew member, and the crew member says, I'm having serious difficulties in the cabin, we can characterize out of hand, out of control. I mean, we can quibble about the wording, but it is a kind of call that crew members don't often make in airplanes and that captains don't usually get. There's some serious disturbance in the view of the flight attendant, of the crew member in the cabin. You don't dispute that. It seems to me once you – I mean, if you – Well, we do, Your Honor. If you don't dispute that – Well, we do. It seems – well, what – Well, we dispute that there was a disturbance. Do you think she – do you think she called and he said everything is hunky-dory? No, Your Honor. What we dispute is that when she called, there was a disturbance in the – in the cabin. No, no. I'm not saying that there was a disturbance in the cabin. He gets – he's not allowed to leave. In fact, we don't want him to leave the cabin because once he opens that door, unpleasant things sometimes happen. So I believe there are regulations that say he can't leave the – the – I'm sorry, the cockpit. He can't leave the cockpit in – in those circumstances. So he has a voice communication from a crew member that there's some level of emergency that indicates to him there's a disturbance in the cabin. That much is – seems to me is undisputed. Your Honor, it – Right? That much is undisputed. Okay. In that case, why can't the captain make a judgment that at that point he's going to take the plane down because, as Judge Roteros pointed out, it's a – it's a tube of metal, aluminum, I guess, flying through the air at 500 miles an hour, very high up. And if anything happens to disturb that path, you could have a lot of people killed. It's a reckless decision, Your Honor, a decision made without the information that was readily available. If you read Captain Swint's declaration – Well, it would have been nice if he'd been able to take the deposition of everybody on there, but he – he probably didn't have a lawyer with him. He could have asked the flight attendant, what's going on? Let me change the question to this. Why under an arbitrary and capricious standard is the decision a bad one? Because when – I mean, the honest truth is most of the case law we have in front of us suggests that we have an arbitrary and capricious standard to apply as to the captain's decision in these situations. We've never said it ourselves in the Ninth, but most do. So if I apply an arbitrary and capricious standard, have we met the level to get rid of summary judgment? No, Your Honor. First of all, the arbitrary and capricious standard has never been applied in a Tokyo convention case. The only Tokyo convention case anybody has cited is the Zickrey case, and it does not apply the arbitrary and capricious standard. It doesn't even use those words. It applies reasonableness. The standard under the domestic cases, Alaska has argued extensively that these Yet, this language is different in the domestic statute than it is from the Tokyo convention, quite different. The – there is no indication in the Traveau Preparatoire that the drafters of the Tokyo convention wanted it to be interpreted in conformance with the domestic statute, and the standard doesn't apply and can't be found in the plain language, which is quite clear of the Tokyo convention. But even if this Court were to conclude that the arbitrary and capricious standard applies, what this Court has said it meant in other contexts is decisions taken without reference to easily available evidence or without an adequate basis for decision. Here, the captain could have looked through the window that Alaska had specially installed, and he could have done so from a seated position, according to Alaska's own press release, which is in the record. All he had to do was to turn around or ask the pilot to turn around, and he could have seen into the first-class cabin. There were three – The – the stewardess informed him she lost control. What is he to do? For one thing – He has – he has a decision to make quickly. He can fly on to Las Vegas or he can divert to Reno. A decision to divert is a significant decision for the airline. It's very costly, disruptive of other passengers. Didn't this pilot make a decision he thought was reasonable under the circumstances? Your Honor, there is a disputed question of material fact as to whether he even made the decision. On the ground, there is a conversation between Mr. Gennana and Mr. Rasik on the one hand and the captain on the other, during which the captain gave my clients his business card. It is in the record, the declarations say, that he admitted to them. They asked him why did he do it, and he said, I have to do as the flight attendant demanded. I had no choice. He abdicated that decision according to substantial evidence in this record. So that's the answer to that question, Your Honor. I'd like to talk briefly – I'm not sure what you get out of that. Well, Your Honor, what we get out of it is – I have to do could mean I'm required by regulations or, you know, I have no reasonable choice. If the – I'm obviously responsible for the crew and passengers and the airplane, and when I get a frantic call from a flight attendant, I have no choice but to put the plane down. I'm a little surprised that you spent all this time on events that happened 30,000 feet up in the air, and you didn't spend any time at all talking about what seems to me is really the – I mean, the question of whether to put the plane down or not strikes me as somewhat irrelevant. If you put the plane down and had investigated the situation and continued the flight, your plans wouldn't have any claim at all, I don't think. I mean, he – a pilot can choose to put the plane down for whatever reasons. I mean, if he thinks he's got an equipment malfunction or he might have an equipment malfunction, he puts the plane down, you know, because it's a safe thing to do. It seems to me your beef really is with what happened on the ground, not what happened up in the air. Well, that is indeed a critical part of the complaint, Your Honor. I'd like to talk briefly about the supplemental complaint. I mean, to me, it strikes me as being the only relevant part of the complaint. I mean, your clients really are not damaged by the fact that he lands at Reno, are they? They're damaged by being turned over to the police and being subject to a federal – Do you hear my question? They are not damaged by the plane landing in Reno? Yes, I mean – Your Honor, they are. They missed a critical business meeting. They were – and that is in the record. Just like everybody else on the plane who was delayed, they missed the meeting because they were taking off the plane. They didn't miss the meeting because the plane landed in Reno. Correct, Your Honor. Okay, so I don't – you know, you spent a lot of time talking about things that seems to me don't matter at all. Your Honor, we see it as a continuous course of conduct that was unreasonable from the get-go. You chose to fight a far more difficult battle, it seems to me, about questioning the judgment of a pilot while he's got a plane flying at something like 30,000 feet at 500 miles an hour with a full load of passengers. So those decisions, it seems to me, courts are very poorly equipped to second guess. It seems to me you have a much better claim – a much better chance of arguing about what happens once he is on the ground and there's no longer a chance for a crash or anything of that sort. But you're tying this up. We'll give you a little time for rebuttal. Why don't we hear from the other side? Okay, Your Honor. I would like to urge the Court not to forget the supplemental complaint and to understand that Alaska has set forth no facts which show that before December 2003, the clients – my clients were on notice that they had to do anything. They did not have a basis for a claim until Alaska disclosed the documents untimely under Rule 34. May it please the Court. Beth Brinkman appearing on behalf of Apelli Alaska Airlines with Ellen Nudelman also at counsel table and Captain Swanigan from Alaska Airlines in attendance. Captain Swanigan's decision and actions to divert the airplane and to disembark the forward cabin was well within the standards of the Tokyo Convention. Well, but let's say it was. I mean, I think we're going to be in a tough position to second-guess that. But that's really not neither here nor there. The passengers who are allowed back on the plane and continue to Vegas are not here suing. The ones that are suing are the ones that were taken off the plane and not allowed and turned over to police and not allowed to proceed with their flight. I mean, if all that happened, he says, look, I got a disturbance. I'm flying a plane. I, you know, I don't have any way of figuring out what's happening in that cabin in a safe way. I can't even leave the cockpit, right? I mean, he's not allowed to leave the cockpit. And even if he could, I mean, how can he figure out what's going on in the middle of a disturbance while he's trying to safely fly a plane? And so he said, I decided to put the plane down. No, no, no. I mean, I can't imagine that a court or a jury or anybody would second-guess that decision. But the decision to have them taken off the plane and, you know, separate the passengers and have some go on to the destinations and have others turned over to the police, now that's a more questionable decision. And that's no longer something that's done while under emergency conditions or flying. And how is that justified? Well, Your Honor, I would say two things. First of all, you do have to take into account what the pilot knew, the captain knew at the time that he was on the plane also. And just to correct the record, I would direct the court's attention to excerpts of record 261 to 262, which is the plaintiff's expert describing the situation, quoting the first class passenger, Sheely, who they say, she explained that after they went to get the phone to call, and this is a quote from their witness, then the lady in row one, a passenger, next to the right port starboard, started yelling something. Now, she goes on to say, I don't remember what it was. I think it was I think it was impolite nor inappropriate considering what was going on. But there was clearly yelling. That's undisputed. I just want to make that clear. And I think that goes to your question as part of what the captain knew when he was also making the decision about disembarking. You see, that doesn't help you in the least because the captain didn't talk to her. Well, my second point. You know, you're doing the same thing. Why are you doing this? Why are you doing this? You don't want to hear what I have to ask? I'm sorry. I had the second point that I was going to answer your question. I apologize, Your Honor. I mean, he had no idea what this lady had to say. He didn't come back. He didn't talk to any of the passengers. So insofar, I mean, for all we know, for all he knew, some of the passengers first class cabin would have said the flight attendant went completely berserk, started yelling at passengers with no provocation, and they did absolutely nothing wrong. Whatever the witness says now, the captain had no idea. I mean, if the witness backs up the flight attendant or whether she backs up the passengers, it is of no consequence because he did not consult with them. He didn't consult with, he didn't ask any questions.  He didn't ask the passengers. He didn't ask other passengers. He simply took the phone call from the flight attendant as conclusive proof. And what's more, turned him over to the police and said these people ought to be prosecuted. Now, I don't know. That strikes me as pretty extreme. He's no longer acting under emergency conditions. What justification is for that? I'd like to say two things, Your Honor. One is I'd like to describe what additional conduct Captain Swannigan did engage in that's in the record, that's undisputed. And then I'd like to talk about the standard that applies. Does that require him to do a full investigation? The additional conduct that he engaged in after it was landed is in the excerpts of record at 458 to 459 in his report about flight irregularity. It is also in, I believe, his deposition testimony at 164 to 165. He took the flight attendant Callaway to the end of the jetway and had a private interview with her when they landed. He talked to her and debriefed her about what went on. And he has the bullet points of that investigation he did through her at the top of page 459. Talks about the passengers causing problems during the departure. They were being distracting during the safety briefing. They were continuing to use cell phones after being asked to turn them off. During the cruise, they congregated near the cockpit by the galley. When they were talking, when the flight attendants then started talking about safety and security regulations, they were, in effect, mocking them, saying you're paranoid, those are stupid. They wouldn't leave the restricted area. Then after verbal warnings, flight attendant Callaway is explaining to Captain Swannigan, who's at this point charged with making this decision about disembarking, that she'd give him the written warning forms that they have and that they were upset about that and they refused to do that. Where did she refuse to do that? What is the that? That they exploded at that point when she gave them the written warning form. That she what? That when she gave them, the flight attendant gave the passengers a written warning form that's in the record. That's at 461. They got upset about that. And all of this, I have to say, is more fully laid out in the depositions and declarations. I don't see it on 461. Show it to me where. 461 at the very bottom of that form. This is the form that they were given. And so there Captain Swannigan did go and trying to. Sorry, I'm sorry. Where does it say that they exploded? On page 459 in the report, two pages before that. It's Captain Swannigan's report. It's a long page. Where? It is the fifth bullet point. One, two, three, four, five. After several verbal warnings, she gave them a written warning and they exploded at that point. And this is more detailed in the depositions and declarations in the record. But I would also like to point out that under the standard here. I'm sorry, let me just. The pilot made three separate decisions. One to divert, the second to disembark the passengers and the third is to deliver. Why was it appropriate for the captain to make the decision to deliver to authorities? If I can just clarify one thing about that claim. That is not part of the delay claim under Article 19 of the Warsaw Convention. The claim one, which is the delay claim, only goes to the diverting and the disembarking. There was no delay related to the deliver. So the deliver claim is under the argument we discussed first that it's preempted by the Warsaw Convention, Article 17. They're claiming state defamation claims based on the delivery. It's based on the report that Captain Swanigan made to the police. That is simply a state defamation claim. And in order to have a claim for injury under the Warsaw Convention that occurs on board or during disembarking or embarking, it can only be for physical bodily injury. So that claim is not part of the delay claim. And we would say that is preempted by the Warsaw Convention. If the court were to find for some reason it wasn't preempted convention, they challenged the disembarking. We would argue that also it would be part of the authorization that is given to the captain and is immunized. And I would point to two points of the Tokyo Convention on that. Article 8.2 and Article 9.3 require a pilot under Article 8 to make a report to the authorities when he has disembarked passengers. And under Article 9.3, the pilot is required to make a report to authorities when they are delivering it to. And I'd emphasize under that standard, Your Honor, it is in his opinion. Article 9, that delivery to is very clearly a subjective standard. And I would urge the court to look to the amici brief that have been filed in this case that do an extraordinarily good job on the history of the Tokyo Convention and the travel preparatory of the various nations. Counsel, let me interrupt. I went through your stuff and what the pilot did and the things that he said and all of this and all of the facts. It was some concern to me the number of people he delivered. I mean, if I go through the facts and what happened here, I don't see any reason to have said all nine of these people ought not fly. I and I guess I have a tough time under any standard reasonable. Abusive discretion. Arbitrary and capricious, how one would get to the idea that all nine get thrown off under the facts as are in the complaint. Your Honor, in fact, the plaintiffs have claimed that they all wanted to go on to another flight and that they were traveling together. But I would also suggest that under the arbitrary and capricious standard that this court has applied in 4490 to the statutory provision, which we think is not as lenient, in fact, as the Tokyo Convention. And as the Second Circuit has applied in our supplemental or the First Circuit has applied, the reasonableness standard here does require that type of. I'm sorry, Your Honor. Does the arbitrary and capricious standard apply to decisions on the ground? I can see it applying up in the air when the captain's flying the plane. But once the plane is on the ground, he's no longer the law. I mean, it's a very different situation. I mean, at that point, he is in the state of Nevada. The laws of Nevada apply. He's no longer essentially the law. Your Honor, this was an international flight that was continuing. And the Tokyo Convention was expressly put forward to have a very discretionary standard there. And it applies for the commander of the aircraft. No, but the question of whether the arbitrary and capricious standard applies to on-the-ground decisions. Yes. And the language... It is... I can understand and accept that you would have something very differential to the captain when the plane is up in the air flying. Is there any case that applies the arbitrary and capricious standard to decisions like this on the ground? I mean, at that point, there's plenty of time. There's no hurry. He could have talked to the... Did he talk? I mean, he didn't talk to this other witness who was right in the cabin. He didn't talk to the passengers and get their side of the story, which he could have done. He could have simply let them back out of the plane. He could have had a talk with them and say, look, guys, we've had some altercation. Behave yourselves. You're allowed back on the plane. Your Honor, this captain was in the middle of an international flight responsible for more than 70 other passengers, a plane that's become a weapon of mass destruction. They're now on the ground. They're now on the ground. But this is the decision to disembark a passenger and to deliver a passenger, which is absolutely covered by the Tokyo Convention, Article 8. That is what Article 8 talks about. Article 6 is about the reasonable measures that can be conducted on a plane. But the question is not whether he can do it. He can do it. And he did do it. The question is whether we allow the same degree of deference to decisions that are made while the plane is flying to decisions that he makes on the ground. They just strike me as very different situations. But there are three reasons I would say that standard does apply. The text, the history, and the analogous statute. And if I could read you the text... It would help me if, in addition to all that, you had a case. There are no cases on this. There is the Israeli case. So if we wrote a case and said, look, it's arbitrary and capricious up in the air. But when you get to the ground, the rule is quite different. There would be nothing to contradict us with that. The case law comes under 44-902. But... Did you hear my question? Yes. Whether or not it would help... And I believe that if you look at the... Is there any authority to contradict us if we do a different standard? Yes. The text of the convention. I will read you Article 8 of the Tokyo Convention. The aircraft commander... And I'm sorry, I'll tell you where that is in the records, Your Honor. It is in the excerpts of record at... 185. The aircraft commander may, insofar as is necessary for the purposes... And it refers to other paragraphs. Article 6, which says the captain could take reasonable means when he has reasonable grounds to believe that a person has committed or is about to commit on board an offense or act contemplated. An act is something that can jeopardize the good order or discipline of the aircraft. Going back to Article 8. In that circumstance, may disembark in the territory of any state in which the aircraft lands. Any person who has reasonable grounds to believe has committed or is about to commit on board the aircraft and act contemplated, as mentioned. He had reasonable grounds to believe that if he allowed this group to re-embark on his plane, that they may commit an act that could affect the good discipline of the plane. And when the various nations were... Is it really good grounds if he hasn't... If he has an opportunity to talk to the actual passengers and to surrounding witnesses and he neglects to do that? Your Honor, we can't turn captains of planes with that responsibility into private investigators. That's why Article 9 has a provision to deliver authorities. Why not? Because they... Why not? Your Honor, in this situation, just to be very concrete, the only people that were removed from the first person cabin... Both sides of the story. I've got a flight attendant who's obviously very upset, and she's told me a bunch of stuff. But, you know, I've been around a long time. I'm an adult human being. I know that when there are disputes between people, there are often two sides of the story. And it's always best to get some accounting from somebody who is not involved in altercation. And I know there are people in the first class cabin who are not involved in altercation. I could talk to them. And I could also talk to these human beings who have a story to tell as well. What would it have cost to do that? It would have cost hours of time, Your Honor. There were 12 passengers in first class. He would have had to talk individually to each of them, which meant they would have had to find a location to speak individually. The only people who were disembarked with these nine... Why couldn't he talk to them as a group? Well, I think anybody... Or why couldn't he ask the flight attendant, was there anybody in the first class cabin who was not involved in this altercation? And she would have said, yes, there was this one person. And he said, well, I'll talk to her and see if she backs you up. And what if he... Let me ask you this question. What if he had talked to... I'm sorry, what is the name? Sheehy? Sheely, I believe. Sheely. And Sheely had said exactly what she says in her deposition. The flight attendant basically lost control and these passengers were fine until the flight attendant started going after them. So he's faced with that situation. What does he do at that point? He exercises his best judgment, Your Honor, and that is what he is trained to do. You agree it's a better judgment if it is more informed? No, Your Honor. I submit there could have been a passenger just behind Sheely that had a completely different view of it. And the captain is charged with getting the flight going as it was. It was an hour delay with the law enforcement meeting the plane and the law enforcement talking to the various... The pilot was in control and asked them to do that. That's what he can do under the Tokyo Convention. And that's his proper role. Would have, could have. Here, not only does the text give incredible discretion to the pilot under the may, could, poss... All these possibilities. The history of the convention is quite clear that the amici go through. There were several attempts to heighten the standard that would be required, a negligence standard or a serious offense. The nation's rejected that. That's set forth in the amici brief. You're saying that the same... It's clear in the history of the convention and in the text that the same standard would apply in the air as on the ground in reference to the decision to disembark. Yes, Your Honor, because these were all under Chapter 3 of the convention, which is called Powers of the Aircraft Commander. That's what those provisions of the Tokyo Convention are about. Now, 44902... We don't have a brief from the United States here, do we? No, we do not, Your Honor. Do you think we should call for the views of Solicitor General on this? I don't think that's necessary, Your Honor. I think that here we have it fully briefed. What if we plan to rule against you? Do you think we should call for the views of Solicitor General then? Excuse me? What if we plan to rule against you? Do you think we should first call for the views of Solicitor General? Perhaps, Your Honor, but I think it has been fully briefed here. And I do commend the Court to look at the Ninth Circuit's precedent... You're asking us to interpret a treaty negotiated by the United States. It seems very strange for us to do that without having the views of our sovereign who negotiated the treaty. Your Honor, there's certainly precedent from this Court under the Cordero case, and under the Second Circuit in the Williams case, and under the First Circuit, I can't really pronounce it, Ascara, which was the Cepulon brief, all under 44902. That statute allows the removal of any passenger who may be inimical to the safety of the craft. The point is that this is a treaty, and those were statutes. Yes, but what I'm saying, Your Honor, is that the standard here is certainly at least that standard, but we would say much more deferential to the commander of the aircraft under the text and the history of that provision. However, if I read the treaty as it is said, I read language. If I read the legislative history, quote-unquote, I don't know whether I have to get there if I read the language of the treaty, quote-unquote, or statute. You continually refer me to this language, the history of how it came together and all that kind of stuff, but I'm talking about the statute itself. I don't see anything in the statute itself that says arbitrary and capricious. I don't say anything that says reasonable. I don't know what it is. So, therefore, I'm asked to make a standard, and not only that, but there is an FAA crew resource management bulletin that says the captain's conduct explicitly requires that prior to taking an extraordinary action, it is incumbent on the captain to gather all the facts available to him in order to make a prudent decision. This is the government talking now. Now, I understand you can have an argument, but my worry is that you expect me to take all this legislative history of this treaty, not the language thereof, make a standard, and then immunize a certain situation with, undoubtedly, a fact situation that is totally something I wouldn't do on summary judgment if I just had a reasonable person's standard. Two things I would say, Your Honor. First of all, as far as the FAA guidance and all that, that's not the question before this court. This question before this court is simply whether or not there can be this action for damages against the airlines. This is a question of immunity of the airlines. It's not whether there can be any FAA discipline or enforcement. That is a different question. This is simply... Well, I'm not talking about it because I'm talking about what the FAA is suggesting as to what I'm supposed to do. I understand my reason. I'm trying to make a standard, and then I'm trying to see if the facts under that standard are applicable to issue a summary judgment. And if I go arbitrary and capricious, okay, then I look at the facts and determine if it meets. If I go unreasonable standard, I might look at the facts and say, go back for summary judgment and decide that. And if I want to have it decided under the treaty, I understand what your remedies are. If I don't want... And it may be that it is absolutely out of the question because it's been preempted, but we got to have a standard to apply the treaty. And I'm trying to look at all the many ways to determine what the standard ought to be and whether the facts meet the standard. Certainly, Your Honor. And I'd submit the second point is the text of Article 8, Article 6, the immunity provision of Article 10. It is couched in terms of reasonable ground to believe whether they may or do commit something that puts in jeopardy the good order discipline is a very broad standard. I was only referring to history to support that, Your Honor. This text stands on its own. It absolutely stands on its own as to the level of discretion that is given to a commander. If the pilot's duty under the FAA regulations is to do a thorough investigation that takes into account all of the available evidence, then why doesn't that tell us what is reasonable for purposes of this treaty? You know, the treaty says reasonable determinants. Well, reasonable is not something that you look at in the abstract. You look at it in the context of the situation. You want to say, well, this was a hurried pilot. He had a flight. He was responsible, all those things. But he was on the ground at that point. The plane was not going to crash. He was not going to run out of fuel as he circled. I mean, this is the plane is now stabilized. And under the applicable regulations in the country which he happens to now be operating, he has a statutory or regulatory responsibility to take into account the views of to conduct a reasonable investigation. We don't believe that's the standard, Your Honor. The Convention talks about reasonable grounds to believe. And I would, again, point to the Cordero. I know you don't believe this, but why don't you explain to me why I should be persuaded? When the word reasonable is used, why don't we look to things like the FAA regulations to determine what's reasonable? Because of the binding precedent of the Cordero case on this court. It's a Ninth Circuit opinion. It had to do with the 44-902 statute that allows removal for someone who's inimical to the safety. But it informs clearly the standard. It's more deferential. It says at least three very important things there. It is the information that's known to the pilot. It specifically says it cannot be based on hindsight. And it specifies that there is no duty to conduct this kind of investigation. That was the situation on the ground, Your Honor. Mr. Cordero was on a flight, an Air Mexicana flight down to somewhere in Mexico, and they diverted to Mazatlan to pick up some more passengers. They disembarked. They would not let him re-embark. He claimed it was an error of identity, and they had mistaken his identity. Those standards were set forth in that situation. There did not have to be an investigation. The pilot was commanding that ship. They were embarking. They were on an international flight. And under the grounds of the statute, he did not have to. And certainly, you're under that binding precedent of the Ninth Circuit. So was he in the United States? Oh, no. He was in Mazatlan. Okay. So the FAA regulations wouldn't have applied, would they? I'm not sure which FAA regulation you're talking about. The one that Judge Smith referred you to. The one that says the pilot should conduct a reasonable investigation, taking into account all of the information available to him. I don't believe that's a regulation, per se. I think it may be a guidance, or there may be crew resource management proposals. But I don't believe it's any kind of binding regulation, Your Honor. That's an ER-259, by the way. Let me just get some clarification. You're asking that the court adopt the arbitrary and capricious standard in the 44-902 line of cases. Is that your point? In our brief, we set out how there are differences between the Tokyo Convention. Is it yes? No. We believe it's more lenient under the Tokyo Convention. And we say that in our brief, and then we explain. If I understand one of the cases, Sekeda, it appears under the Sekeda, the court has created a presumption, a rebuttable presumption, that the actions of the pilot are reasonable, and it's up to the passenger to demonstrate or offer evidence that they're arbitrary and capricious. Is that the way you read the case? That's the First Circuit case that I could not pronounce. Yes, Your Honor. I think that may be a way to interpret that case. We certainly think it cites the Cordero standard. It cites Williams. And it says, like the Ninth Circuit that followed the Williams case of the Second Circuit, the First Circuit, too, is going to follow the Second Circuit on that. I read it as a reasonable standard based on what's known to the pilot. Well, the court says it is the plaintiff who carries the burden of showing that the 44-902 is inapplicable. That sounds like a presumption there. I have to say, Your Honor, this text of 44-902 has no standard whatsoever. The courts have read into it the reasonableness standard because 44-902B says permissive refusal subject to regulations of the undersecretary, an air carrier, interstate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is or might be inimical to safety. And some lower courts had held that was absolute per se. And it was the Court of Appeal that said, no, we're going to at least inject a reasonableness standard. And if the Stanford band is on the plane and causes a disruption, is the pilot supposed to conduct an investigation as to which members of the band should be removed and which members should remain? That's a rhetorical question. Well, I don't mean to be light here at all, but I attended Cal undergraduate. That's actually occurred in the past. You know, that would perhaps influence my answer to that question. I do think that it is within the discretion and the broad training expertise. So if the pilot notices that one of the passengers is somebody who he has a personal grudge against, perhaps he has stolen his wife or something in the past, he can decide to remove him. And that's final. In your view, he has an animus against this individual. And he decides, you know, I'm going to make life difficult for him. I know he probably can't catch another flight because the difficulty is catching flights to that location. And I'm just going to have him removed. Under your view, Tokyo protection, right? No, I think it's arbitrary and capricious and unreasonable, Your Honor. And I have to say, as far as animus goes, if there was some other kind of animus that's been alleged, there's no evidence of that whatsoever. There are statutes that also allow the Department of Transportation to take action against carriers. There's disagreement about whether or not there's a private cause of action under that. But there certainly is a D.O.T. cause of action under that. And the Second Circuit in the King case, which I apologize is not cited anywhere, has held that the private right of action. I'm sorry, do they have a D.O.T. cause of action? No, the D.O.T. could have enforcement authority against an airline that has discriminated. In fact, the Department of Transportation has exercised that authority since September 11th and entered in some very substantial, I understand, payments and consent decrees with various airlines. The question about whether the Warsaw Convention would preempt some of that comes up. But the Second Circuit has held it does not preempt the FAA enforcement because the Warsaw preemption goes to damages actions. Okay. Thank you. Thank you. We'll give you a couple of minutes for rebuttal. Very briefly, Your Honors. This isn't just a case about the passengers being disembarked. They were disembarked. The captain turned them over to the police and put them through the police report, which did cause them further delay despite counsel's claims otherwise being interviewed by the police and then insisted that they be prosecuted for federal felonies for up to 20 years, up to 20 years in prison and interference with a flight crew. And I think Judge Smith zeroed in on one of the main problems with this, that there is no evidence specific to any of these people with any of them committed anything like a federal felony. In Article 9, which counsel insisted. What are you talking about? I'm sorry, when I say what, Your Honor? They'd be prosecuted. Who did they talk to? What did they do to to? The police report reflects clearly that the captain told the police he wanted all nine passengers arrested and prosecuted for interference with a flight crew. Isn't that what the 44, 46504 prohibits? That's the substantive offense, Your Honor. Yes, but there's no evidence that all nine people or any of them in particular committed that here. And the pertinent legal standard under the convention, Tokyo Convention, is in Article 9. It says the aircraft commander may deliver to the competent authorities, law enforcement, any person, a specific person, that is not a group of people, not all nine passengers or everyone in the cabin, that he has reasonable grounds to believe has committed on board the aircraft a serious offense. And the only reference to subjectivity that comes in the entire Tokyo Convention provisions is whether in the captain's opinion it's a serious offense. Everything else by exclusion is not in his opinion, not subjective, therefore objectively reasonable. We're really talking about preemption here. And I guess I'm trying to get to that. The Ninth Circuit has, in Magni versus Compagni, said that there are three things I need to think about when I'm looking about preemption. The passenger's location at the time of injury, the nature of the activity, the extent of the control over the passenger at the time of the injury. Now, how can I, in trying to determine that, suggest that what the captain did at the time he came down and did what he did, as far as reporting to his knowledge what he had to do, why he came down and what the situation was, seems to me that those are at least situations in which they're in the period of disembarkment and therefore he's just reporting what went on at the appropriate situation. Tell me how I get to that, because I don't see any reason why that total circumstances surrounding the injuries, why those aren't preempted. Okay. Your Honor, with due respect, one thing is he's not just reporting. He's insisting, as I just tried to point out, that these people be prosecuted. Right. But what does insisting mean? He doesn't have he's not a prosecutor. It's sort of like a witness. It's sort of like calling somebody on a domestic disturbance. And saying, oh, I insist that you prosecute. What does that mean? He has no authority to force a prosecution. This is his personal opinion. Your Honor, under Article 9, he can deliver to competent authorities anybody that he has reasonable grounds to believe has committed a serious offense. That's right, but that's what the witness was asking about, and you said, oh, well, he did more than that. That's preempted. The turning over is preempted because that's authorized by statute. He said, oh, there's more. He insisted, and I'm not sure what insisted means or why that makes any difference or what does the insistence of an airline captain have to do with it. He's not a prosecutor. He's not a law enforcement agent. I mean, he can't. He certainly didn't get the job done because the police promptly determined that there was no crime committed. Well, that's even more why it isn't a problem. Now, let's go on to the in-flight statement. I mean, certainly that's in continuation of the flight. There's nothing suggesting that even if they did it, and I'm not sure the record even suggests what happened. I'm worried about that for you. But that's an in-flight statement just getting on said week went down because there was a problem in the first class. How can I say that wasn't a part of the flight? Your Honor, if the Court will look to the three factors that are set forth in the location of the passengers at the time of the incident, and here they're in the common area of the airport, the activity of the passengers at the time, not the activity of the airline employees, and they're being interviewed by police and the TSA, and whether or not the airline is in control of the passengers at the time. And the airline isn't because they've turned the passengers over, all nine of them, to the police. So when you match up those three factors as they're set forth in all the previous cases, you come to a conclusion that all three favor the plaintiffs here. What is the evidence, going back to Judge Smith's point, what is the evidence in the record that establishes that there was a defamatory statement made on the return flight to Las Vegas? Your Honor, that was dismissed, so we don't have any evidence in the record. It was dismissed on the pleading, so we weren't able to do discovery on that. So we don't have that. It's referenced in the complaint, but there's nothing. That's correct. It's not in this record. We were not permitted to, we couldn't do discovery on it because it was dismissed before discovery. Your Honor, I just want to say that. I also would suggest, I mean, you argued that you wanted to do all this supplemental complaint under 15D. Yes, Your Honor. I don't see any reason why this is a 15D amendment at all. It certainly isn't facts that came up after the complaint. It's facts that came up after the airline had done something, and then you had certain time to file your complaint, and these are facts that had already occurred. They're not, they may have been discovered after you filed the complaint, but it doesn't come up under 15D at all. I'm unclear as to the Court's reasoning. 15D doesn't talk about facts discovered after. It talks about facts discovered that happened after the complaint had been filed. These aren't facts that happened after the complaint had been filed. These are facts that had already taken place. This is where the accrual rule comes in, Your Honor. Well, I understand, but you don't go under 15D to argue the accrual rule. You're under 15A, and you didn't even give the judge the chance to look at it. Your Honor, under 15A, we were precluded by the gamesmanship of Alaska Airlines. You didn't even argue 15A. We couldn't. Why didn't you move under 15A? Because the deadline had passed to move under 15A on October 15th, and we didn't discover the documents. That is, they didn't turn them over until November 17th and November 7th. Why didn't you move for relief from the scheduling order under 15A? We contemplated doing that, but when we looked at this Court's cases, notably the Cabrera case, it says pretty equivocally that it doesn't much matter whether you use it as a supplemental complaint or an amended complaint. The same rule of allowing pleadings freely to do justice under the federal rules applies. So we thought from that language that the Ninth Circuit doesn't stand on technicalities. That's the law of the circuit. Between supplemental and amended complaints, the circuit has not so far used a fine razor to delineate them and has said it won't. Do you think we should ask for the views of the United States on this? Your Honor, the plaintiffs have no objection to asking for the views of anybody that the Court thinks will be of assistance as long as we get the opportunity, and I'm sure Alaska will as well, to respond. If the Court thinks it would be helpful, then perhaps it would be. Okay. Thank you. Thank you, Your Honor. The case is argued. The rule stands submitted.
judges: Kozinski, Smith, Otero